**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re:                                              :          Chapter 11
                                                    :
HANS FUTTERMAN,                                     :          Case No. 17-12899 (MEW)
                                                    :
                              Debtor.               :
----------------------------------------------------------------x
RWNIH-DL 122nd STREET 1 LLC,                        :
                                                    :
                              Plaintiff,            :
                                                    :
              -against-                             :          Adv. Pro. No. 17-01223 (MEW)
                                                    :
HANS FUTTERMAN,                                     :
                                                    :
                              Defendant.            :
----------------------------------------------------------------x

## BENCH DECISION CONCERNING MOTION BY CHAPTER 11 TRUSTEE FOR APPROVAL OF PROPOSED SETTLEMENT

Before the Court is the motion by Gregory Messer, the trustee in the Chapter 11 case of

Hans Futterman, for approval of a settlement he has negotiated with entities named RWNIH-DL

122nd Street 1 LLC and West 112 Associates, LLC.  I will refer to Mr. Messer as the "Trustee."

I will refer to RWNIH-DL 122nd Street 1 LLC as "RWN," and I will refer to RWN and West 122

Associates LLC collectively as the "RWN Parties."  This bench decision is based on rulings that

the Court announced in open court on June 13, 2019.  It constitutes the Court's final decision

with respect to the motion.

### Background

The debtor, Hans Futterman, is a real estate developer.  He has been involved in a

number of development projects that are relevant to the proposed settlement agreement and to

some of the objections that Mr. Futterman has posed.  One such project was a development that I

will refer to as the "Ladera Project."  Mr. Futterman was the ultimate owner of one hundred

1

percent of the membership interests in Ladera Parent LLC, which in turn owned one hundred percent of the membership interests in Ladera, LLC.  Ladera, LLC owned a property at 300 West 122nd Street in New York that it hoped to develop.  It borrowed money from RWN for that purpose.

The Ladera entities filed Chapter 11 bankruptcy petitions in early December 2016.  They attempted to arrange a refinancing of their debts but did not succeed in doing so.  On March 29, 2017, they proposed a plan of reorganization under which the properties would be sold.  It appeared, to the Court at least, that at that time the Ladera debtors and RWN were working together.  The Court approved bidding procedures in an order dated May 17, 2017, and approved a short postponement of a scheduled auction in an order dated June 21, 2017.

Shortly thereafter, however, the Ladera debtors decided they did not wish to go forward with a sale and an auction, and they withdrew their request for approval of a sale.  The cancellation of the sale was hotly disputed, and the Ladera debtors and RWN each made competing proposals as to how to move forward.  The Ladera debtors wanted to pursue a refinancing, and RWN wished to put forward its own plan that would require a sale.  After some back-and-forth, and with the agreement of the parties, the potentially competing approaches were resolved by an agreement under which the Court would enter an order confirming the Ladera debtors' proposed plan (which would enable them to attempt to refinance their debts), but that would include a deadline for doing so, with the understanding that if the relevant financing was not accomplished by the drop-dead date, then the confirmation order would be vacated and RWN's plan would instead be confirmed and would become effective.  In the event the RWN plan became effective, there would be a sale of the Ladera property.

The Ladera entities did not complete their proposed transaction by the relevant deadline and their plan therefore did not become effective.  At that point, the prior confirmation order was negated and the RWN plan was confirmed.  There are other developments in the Ladera cases that occurred after the confirmation of the RWN plan and that are relevant to the issues that are presently before me, but I will describe those other events further below, after I first finish my description of the other development projects in which Mr. Futterman and his entities have been involved.

The second important project in which Mr. Futterman and his entities were involved and that has some relevance to the motion before me was the development of real property at 2280 Frederick Douglass Boulevard in Manhattan.  I will refer to that project as the "2280 Project."  There were many entities, some of which have outside investors, that were involved in the 2280 Project.  It is not necessary to list them all here.  However, I should note that there were a number of disputes over the 2280 Project that resulted in an arbitration proceeding in which the arbitrator held that Mr. Futterman had breached certain obligations he owed to other investors.  The details of those disputes and of the arbitrator's decision are set forth in more detail in a bench decision that I issued on May 9, 2018 [Dkt. No. 143].  For the reasons set forth in that bench decision, I appointed a trustee to take charge of Mr. Futterman's estate in his personal chapter 11 case.

The third property that is relevant to the motion before me is a currently undeveloped lot at 311 West 121st Street in Manhattan.  The parties have referred to this property as the "Lot 24 Property" and I will use that terminology in this decision.  The Lot 24 Property is owned by an entity known as Jenco 121 LLC, which I will refer to as "Jenco."  Jenco is a New York limited liability company, and Mr. Futterman owns one hundred percent of the limited liability company

membership interests in Jenco. The Lot 24 Property is currently vacant and undeveloped. As I will discuss in a moment, there is a dispute as to just what development rights the Lot 24 owner has retained and what rights it has sold to Ladera.

Finally, Mr. Futterman owns other properties, at least two of which are jointly owned with his wife. Those are relevant in assessing the assets of the estate and in evaluating the parties' conflicting positions about the likely recoveries in this Chapter 11 case, but they are not otherwise relevant to the issues that are before me in connection with the Trustee's motion.

### Prior Proceedings

Pursuant to the confirmed RWN plan in the Ladera cases, an auction sale was held in September 2017. At the auction, RWN made a credit bid in the amount of $48,600,000, plus the assumption of certain other obligations. The RWN credit bid was designated as the winning bid at the auction. Mr. Futterman asked informally for more time to object to the outcome of the auction, and on September 21, 2017 the Court considered that request in a telephone conference. After evaluating the parties' contentions, the Court denied the request for an extension of time. Mr. Futterman then did not file objections, and the next day, on September 22, 2017, the Court entered an order approving the sale of the property to RWN or its designee.

The RWN credit bid was in an amount that was less than the amount it claimed it was owed. Mr. Futterman was a guarantor of the obligations that the Ladera entities owed to RWN. I should note that Jenco is also a guarantor of the obligations owed to RWN and has granted a security interest in the Lot 24 Property in support of that guarantee. Mr. Futterman's interests in the chain of entities that own the 2280 Project also were pledged to RWN in support of Mr. Futterman's guarantee of the Ladera entities' obligations.

RWN eventually filed suit against Mr. Futterman in the New York state court to enforce the guarantee and its security interests in other assets. Mr. Futterman thereafter filed a chapter 11 bankruptcy petition. RWN's state court lawsuit has since been removed to this Court. RWN has also filed a proof of claim in Mr. Futterman's Chapter 11 case, to which Mr. Futterman has objected.

In September 2018, Mr. Futterman also caused his attorneys to file a lawsuit against RWN, purportedly on behalf of the Ladera entities and also on behalf of himself as the purported owner of the Ladera entities. He alleged that RWN had agreed to sell the Ladera properties to an affiliate of a company named Happy Living, and that RWN had interfered with the auction process in an effort to reduce competition and to acquire the Ladera assets at a relatively low price so that it could then sell the assets to Happy Living at a higher price. He further contended that the profits RWN pocketed as a result of its deal with Happy Living rightfully belong to Ladera and/or to Mr. Futterman himself. On that theory, Mr. Futterman sought monetary damages of more than thirty million dollars.

However, under the terms of the confirmed Ladera plan of reorganization (the plan that RWN had proposed and that was confirmed), Mr. Futterman's membership interests in the Ladera entities were cancelled, and control over the Ladera entities was vested in Esther DuVal, the plan administrator. Ms. DuVal had not authorized the filing of suit on behalf of the Ladera entities and stated that she did not wish to do so. In addition, even if Mr. Futterman had retained any interests in the Ladera entities or any rights to make claims on their behalf, those rights belonged to the Trustee in Mr. Futterman's chapter 11 case. Similarly, any claims that Mr. Futterman wished to pursue in his own name likewise belonged to the Trustee in his chapter 11 case. The Trustee did not authorize the filing of suit against RWN and stated, at the time, that he

5

did not wish to do so.  The Court therefore dismissed the lawsuit against RWN in an order dated December 13, 2018.  The dismissal was based on lack of standing and was without prejudice should Ms. DuVal or the Trustee elect to pursue claims against RWN.

Although I held that Mr. Futterman did not have standing to assert affirmative claims that belonged to Ms. DuVal and/or to the Trustee, that, in my opinion, did not affect Mr. Futterman's right to object, as a defensive matter, to the RWN deficiency claim in Mr. Futterman's chapter 11 case.  This is because section 502 of the Bankruptcy Code provides that any "party in interest" in a bankruptcy case has the right to object to a proof of claim.  *See* 11 U.SC. § 502(a). As the debtor, Mr. Futterman is a party-in-interest in his own bankruptcy case, and therefore in my opinion has standing to pose an objection to the RWN proof of claim, and he has done so. Mr. Futterman's objection to the claim, and RWN's lawsuit against Mr. Futterman, have been the subject of considerable discovery for approximately the past nine months.

### The Proposed Settlement

The Trustee now seeks approval of a settlement he has negotiated with the RWN Parties. The key terms of the proposed settlement are as follows.

First, RWN's deficiency claim against Mr. Futterman and the entities he owns will be withdrawn and released in its entirety.

Second, the Trustee, on behalf of Mr. Futterman, will give up rights to pursue purported derivative claims against RWN, based on Mr. Futterman's prior ownership of the Ladera entities. This agreement will bind Mr. Futterman and his estate but it will not affect other parties, including Ms. DuVal (the plan administrator in the Ladera entities' cases), or the Ladera entities themselves, or rights belonging to other creditors of Ladera (if they have any such rights and should they ever decide to pursue them).

<u>Third</u>, RWN will pay $1,675,000 to Mr. Futterman's estate.

<u>Fourth</u>, the Trustee has agreed to various terms regarding development restrictions that are applicable to Lot 24, most of which are confirmations of restrictions that allegedly are set forth in prior contracts. As I understand it, the Trustee will also use his control over Jenco to agree to those terms on behalf of Jenco. I will describe those terms in some detail in a few minutes, because they are the subject of the biggest part of Mr. Futterman's objections.

Mr. Futterman takes issue with the proposed settlement. He claims that the defeat of the RWN deficiency claim is a virtual certainty, such that the withdrawal of that claim is of little real benefit to the estate. He also contends that the agreements that the Trustee proposes to make as to Lot 24 impose new development restrictions that do not presently exist and that will effectively prevent a development of that property, and thereby unduly deprive the estate of a valuable asset.

### The Trustee's Authority to Settle RWN's Claims

I will start first with a discussion of the Trustee's authority to settle.

As explained above, Mr. Futterman had the right to file an objection to RWN's deficiency claim under section 502 of the Bankruptcy Code, which permits parties in interest to file objections to claims. However, while the Bankruptcy Code may be generous in granting the right to raise objections, and while the Court has held that Mr. Futterman had the right to file an objection to the RWN deficiency claim, it is the Trustee who is the primary representative of the estate and who has the authority to take action on behalf of the estate. That primary authority includes the right, on behalf of the estate, to settle any claims that are made against the estate, which include the claims that RWN has asserted in both the removed state court action and the proof of claim that RWN has filed.

Rule 9019 of the Federal Rules of Bankruptcy Procedure makes this clear, as it explicitly permits a trustee to enter into settlements. *See* Fed. R. Bankr. P. 9019. So long as the Court approves, the Trustee has the authority to settle claims, and that is true even if other parties in interest have filed objections to those claims. *See, e.g.*, *Law Debenture Tr. Comp. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 96 (D. Del. 2006) (affirming bankruptcy court's approval of a settlement by a chapter 11 trustee of one creditor's proof of claim despite another creditor's objection to the claim); *In re DVR, LLC*, 582 B.R. 507, 521–522 (Bankr. D. Colo. 2018) (noting that a creditor who initiates a claim objection will act in its self-interest and, accordingly, the trustee is entitled to propose a settlement resolving that objection, because only the trustee can "protect the interests of the overall estate," and because a contrary ruling would permit a creditor to hold the estate "hostage to protracted litigation"); *In re Heritage Org., LLC*, 375 B.R. 230, 285 (Bankr. N.D. Tex. 2007) (rejecting a creditor group's arguments that the Chapter 11 trustee lacked authority to settle their objections to certain proofs of claim); *Prin Corp. v. Altman (In re Altman)*, 265 B.R. 652, 659 (Bankr. D. Conn. 2001) (approving a proposed settlement between the chapter 11 trustee and a creditor resolving the creditor's proof of claim, where the chapter 11 debtor had objected to the claim).

Parties in interest have the right to object to the wisdom of a settlement if they do not think that the settlement makes sense. But as Mr. Futterman's attorneys have conceded in a prior hearing, the fact that Mr. Futterman was allowed to raise an objection to the RWN deficiency claim does not mean that Mr. Futterman himself has the right to veto a settlement, or to insist on continuing a litigation that would have the effect of vetoing the Trustee's settlement, or that, by virtue of his objection, Mr. Futterman now personally owns the right to control the disposition of the deficiency claim. Instead, his rights are limited to the rights that a party in interest has to

object to the wisdom of the Trustee's settlement decision under Rule 9019.  If the rule were

otherwise, then bankruptcy cases routinely would be stalemated.  Trustees would never be able

to settle claims without unanimous support for the settlement, because any dissatisfied party in

interest could derail a compromise just by filing its own objection to a claim and demanding

control over the disposition of its own objection.  The effect would be to turn over control of

certain parts of the estate (namely the resolution of claims) to parties other than the trustee,

which is exactly the opposite of what the Bankruptcy Code envisions.

Mr. Futterman's attorneys have also acknowledged that they do not contend that the

Trustee suffers from any conflict of interest. Instead, they contend that the Trustee has not made

a reasonable judgment in entering into the proposed settlement.  They also claim, as I will

discuss below, that there is likely to be a surplus in this case, so that Mr. Futterman's own

personal wishes should be given greater weight than they might otherwise be given in deciding

whether the settlement should be approved.  Finally, they have argued that a number of major

creditors have similarly expressed their opposition to the settlement.

### Legal Standard Governing the Motion for Approval of the Settlement

As a general matter, settlements and compromises are favored in bankruptcy, just as they

are in non-bankruptcy matters.  Settlements may eliminate costs and delays and may thereby

"further the parties' interests in expediting the administration of the bankruptcy estate." *In re

MF Global Inc.*, No. 11–2790 (MG), 2012 WL 3242533, at *5 (Bankr. S.D.N.Y., Aug. 10,

2010); *see also Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium

Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in

bankruptcy because they "help clear a path for the efficient administration of the bankrupt

estate").

That does not mean, however, that settlements automatically are approved.  A court may

not approve a settlement under Rule 9019 without first determining that the settlement is fair,

equitable, and in the best interests of the estate.  *See Protective Comm. for Indep. Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *Air Line Pilots Ass'n v. Am.*

*Nat'l Bank and Tr. Company (In re Ionosphere Clubs)*, 156 B.R. 414, 455 (S.D.N.Y. 1993), *aff'd*

17 F.3d 600 (2d Cir. 1994); *see also MF Global Inc.*, 2012 WL 3242533, at *5.

The Second Circuit Court of Appeals has identified a number of factors to be considered

by the bankruptcy courts in evaluating proposed settlements.  Those factors are:

(1)     a comparison between the possibility of success and the benefits offered by the

settlement;

(2)     the likelihood of complex and protracted litigation in the absence of a settlement;

(3)     the interests of creditors, including the degree to which creditors either do not

object to or affirmatively support the proposed settlement;

(4)     whether other parties in interest support the settlement;

(5)     the competency and experience of counsel supporting the settlement, and the

experience of the bankruptcy judge in reviewing the settlement;

(6)     the nature and breadth of the releases to be obtained by officers and directors; and

(7)     the extent to which the settlement is the result of arm's-length bargaining.

*See Motorola*, 478 F.3d, at 462 (citations omitted).

When it applies the foregoing factors, a bankruptcy court should ensure that it is

"apprised of those facts that are necessary to enable it to evaluate the settlement and to make a

considered and independent judgment."  *In re Adelphia Communications Corp.*, 327 B.R. 143,

159 (Bankr. S.D.N.Y. 2005).  However, the Court need not "hold a mini-trial" on the merits of

the potential claim.  *See In re Enron*, No. 02 Civ. 8489 (AKH), 2003 WL 230838, at *2 (Jan. 31,

2003).  The point is to decide if a settlement is a reasonable one.  That is a determination that

ultimately is a matter of business judgment.  Under that business judgment standard, settlements

normally are approved so long as they do not fall below the lowest point in a range of

reasonableness.  *See Cosoff v. Rodman (In re W.T. Grant Company)*, 699 F.2d 599, 608 (2d. Cir.

1983); *In re WorldCom Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

### The Hearing to Consider Approval of the Settlement

In this particular case, there is a strong chance that whatever ruling I make on the motion

for approval of the settlement will be the subject of an appeal.  Mr. Futterman on the one hand,

and the RWN Parties on the other hand, have shown that they have plenty of enthusiasm and

stamina for litigation, fueled by a considerable amount of ill will that has developed over the past

few years.  I have therefore made a far more in-depth consideration of the evidence and of the

issues than normally would have been the case in considering a proposed settlement.

More particularly, I received argument and evidence over the course of most of two days

– on May 23 and 24 – including the testimony of four witnesses.  The Trustee, Mr. Messer,

testified as to his negotiations with RWN, the assets and liabilities of the Futterman estate, the

effect of the proposed settlement on the estate, and the reasons why he believes the settlement

should be approved.  The Trustee's expert witness, Mr. Jeremiah Candreva, testified about

zoning issues and other limits on development rights that he believes are already applicable to

the Lot 24 Property, and about his opinions as to whether the proposed settlement would

sacrifice important rights that the Lot 24 owner currently has.  Mr. Futterman testified about

agreements that relate to the development of the Lot 24 Property and how he believes those

agreements should be interpreted.  He also expressed his reasons for opposing the settlement.

11

Mr. Futterman also offered an expert witness, Mr. Howard Goldman, who testified about certain zoning matters relevant to the Lot 24 Property.

After the close of evidence, and at the beginning of closing arguments, Mr. Futterman's counsel expressed confusion as to whether he was supposed to offer evidence for the Court to consider only in regard to the Lot 24 issues or also in regard to the likelihood of success of the objection to RWN's deficiency claim. I then reopened the record to permit such evidence to be provided. Mr. Futterman resumed his testimony, and he outlined various matters that he believed had been unearthed during the course of discovery. Mr. Futterman's counsel also introduced into evidence copies of various emails and other documents that allegedly showed that there had been improper conduct by RWN, or defects in the auction process that occurred in the Ladera cases.

To be certain that the record before me was complete, I also permitted the parties to submit the portions of certain deposition testimony that they thought I should consider in evaluating the strengths and weaknesses of the objection to the deficiency claim. I should note that much of the evidence that was offered did not have the full showings of authenticity or admissibility that would have been required at a trial. However, my task at this stage, as noted above, is to assess the reasonableness of the settlement, not to try the merits of the case. For that purpose, I agreed to consider these matters as indications of what Mr. Futterman believes he would be able to prove and as to the evidence he believes he would be able to authenticate and to introduce in support of his objection.

Finally, during much of the hearing the parties debated the significance of certain language that appears in a Zoning Lot Development and Easement Agreement dated as of December 27, 2013. The parties referred to this agreement as the "ZLDA," and I will use that

same reference here.  It appeared clear from the testimony and from the language of one of the

recitals of the ZLDA that there likely was a separate sale contract through which the prior owner

of the Lot 24 Property had sold certain development rights to Ladera.  I therefore directed the

parties to submit a copy of that contract to the Court.

I left the trial record open until the deposition excerpts and the contract were supplied.

They were supplied to the Court during the week of May 27, and the factual record is now

closed.

### Issues Bearing on the Propriety of the Settlement

I have considered the full record.  In considering whether the settlement should be

approved, there are three main topics that I should address.  The first issue is the significance of

the RWN claim in the context of Mr. Futterman's case.  The second issue is the reasonableness

of those portions of the settlement that relate to the RWN deficiency claim.  The third issue is the

reasonableness of those portions of the settlement that relate to Lot 24.

Some of these issues are interrelated, of course.  For example, Mr. Futterman contends

that a defeat of the deficiency claim is a foregone conclusion and, therefore, that the proposed

withdrawal of the deficiency claim under the settlement should not be given weight when

considering the other terms of the settlement.  But nevertheless, it is helpful to discuss the three

issues separately.

1.    **The Significance of RWN's Deficiency Claim
      In Mr. Futterman's Bankruptcy Case**

The RWN claim is a secured claim.  It is secured by the interests in the 2280 Project and

any recoveries that may be obtained from continuing sales of units of that project.  It is also

secured by the estate's interests in Jenco and by the Lot 24 Property.

13

The RWN claim was filed in the amount of $10,729,240.  As the holder of a secured

claim, however, RWN would be entitled to collect interest at the default rate if the claim were to

be allowed and if the value of the collateral were sufficient to cover the claim.  As a secured

creditor, RWN also would be entitled to collect attorneys' fees if the claim were to be allowed

and if the value of the collateral were sufficient to pay those fees.  *See* 11 U.S.C. § 506(b).  The

Trustee testified that the RWN deficiency claim has likely increased to roughly $13 million or

$14 million because of default interest that has continued to accrue and attorneys' fees that have

accrued.  Mr. Futterman did not endorse that calculation, but he did not really dispute it either.

The Trustee estimated that accrued administrative claims are approximately $650,000 to

$700,000 in Mr. Futterman's chapter 11 case, excluding amounts that might be asserted by Mr.

Futterman's own retained professionals.  The Trustee also noted that a priority claim had been

filed in the case by the IRS, in the amount of approximately $144,000.  If there were money left

over after payment of RWN's claims, those administrative and priority claims would have to be

paid before other claims could be paid.

The other filed claims in Mr. Futterman's chapter 11 case total approximately $6.2

million.  In addition, there are two claims of undetermined amounts.  One is a claim filed by the

minority shareholders in various entities that are investors in the 2280 Project, asserting that they

suffered damages arising from Mr. Futterman's alleged self-dealing and diversion of

opportunities away from those investors and entities.  The second claim was filed by the plan

administrator (Ms. DuVal) on behalf of the Ladera debtors.  This claim reserves the plan

administrator's rights concerning pre-petition transfers that may have been made by the Ladera

debtors to Mr. Futterman and that might be the subject of avoidance claims under the Bankruptcy

Code.  While no such avoidance action has been filed by Ms. DuVal against Mr. Futterman to

14

date, the parties have agreed to toll the statute-of-limitations period for the assertion of such claims, and that action therefore may still be filed in the future.

The assets of the Futterman estate include the estate's ownership interests in the entities that own the 2280 property.  Mr. Futterman contends that the sale of remaining condominium units owned by those entities should generate $7 million for the estate.  As the Trustee notes, however, other investors in the 2280 Project contend that Mr. Futterman took improper prior distributions from the relevant entities and that they have a right to recover those sums and, if successful, those claims would reduce or even possibly eliminate the amount payable to the estate.  Neither party offered much detail as to these particular disputes or any evidence about them, so I can only conclude that there is a potential asset of $7 million but that there are some uncertainties as to whether the estate ultimately will recognize a recovery from the 2280 Project in that amount.

Mr. Futterman also owns several properties jointly with his wife.  The value that would be available to creditors in this chapter 11 case would not include the one-half share owned by Mr. Futterman's wife.  The value available to creditors also would exclude any portion of Mr. Futterman's own interests that are exempt from inclusion in his bankruptcy estate.  The testimony showed that Mr. Futterman's one-half interests, net of amounts for which exemptions may be claimed, are worth approximately $1.85 million.

Finally, Mr. Futterman owns Jenco, which in turn owns Lot 24.  Mr. Futterman contends that Lot 24 has a potential value of $7 to $8 million, though his assumptions in making that valuation rested on certain arguments about development rights that were hotly disputed by the other parties.

It is plain from the foregoing figures that if the RWN claim actually were to be allowed as a secured claim, there would not likely be sufficient assets to pay all of the secured, administrative, priority and unsecured claims in Mr. Futterman's case and, therefore, there would be no surplus for Mr. Futterman himself. The claims would total between $20 million and $21 million, while the assets (even if Mr. Futterman were correct) would total between $15 million and $16 million. Mr. Futterman speculated that unsecured claims could be resolved for $3.5 million in light of concessions that he believed some of the creditors would make, but even if that were to happen there would still be a shortage. All of Mr. Futterman's many contentions about a likely surplus hinge on his contention that the RWN deficiency claim is not real and that a defeat of the claim is a foregone conclusion.

Even if the RWN claim were to be defeated, Mr. Futterman's arguments about a surplus are subject to doubt. Mr. Futterman contends that Jenco still owns or may use significant development rights for the Lot 24 Property, but as I have noted the Trustee disputes that contention, and the evidence before the Court plainly casts doubt on the ability of any owner to develop the Lot 24 Property, as I will discuss below. As to the 2280 Project, I simply do not have enough details about the disputes concerning it to be able to evaluate the likelihood that the recoveries will be realized. However, based on the evidence, there is a reasonable chance that there would not be enough to pay all creditors even if the RWN deficiency claim were defeated.

**2.      Provisions of the Proposed Settlement
        Relating to RWN's Deficiency Claim**

The proposed settlement agreement provides that the RWN deficiency claim will be withdrawn in its entirety. The estate itself, on behalf of Mr. Futterman, also will waive any right that it arguably might have to file what I will describe as derivative claims against RWN, based on Mr. Futterman's former ownership of interests in the Ladera debtors. However, nothing

16

about the settlement will affect claims owned by Ms. DuVal should she believe that the Ladera

entities have valid claims and should she decide to pursue them.  As I noted before, the

settlement will also not affect any rights that other Ladera creditors may have to petition Ms.

DuVal to take action, or to assert whatever legal rights they think they might have.

In that regard, the settlement accomplishes the maximum that could be accomplished by

the estate and by Mr. Futterman with respect to the objection to the RWN deficiency claim.  The

pending objection seeks the disallowance of the claim, and the settlement will result in the

withdrawal of the claim in its entirety.  I have previously held that any separate rights to pursue

affirmative claims against RWN belong to Ladera and not to Mr. Futterman or his trustee, and

those rights are fully preserved and not affected by the settlement.

The withdrawal of the RWN deficiency claim may not assure that the estate will be able

to pay its creditors in full, for the reasons stated above, but it certainly substantially increases the

odds that the estate may be able to do so, and certainly increases the likely payment amounts that

unsecured creditors will receive, even if they are not paid in full.

During a hearing on May 9, 2019, counsel to Mr. Futterman acknowledged that, in light

of the Court's prior rulings about Mr. Futterman's standing, the settlement accomplishes the

equivalent of a full victory as to the RWN deficiency claim.  But he argued that the defeat of the

deficiency claim is inevitable.  He therefore argued that creditors will not really receive a benefit

from this part of the settlement, and that this part of the deal also should not be considered as

offering value that is sufficient to justify the concessions that the Trustee allegedly is making

with respect to the Lot 24 Property.  However, I have reviewed the evidence that has been

provided, and I disagree with the contention that the defeat of the deficiency claim is a foregone

conclusion.

The Court has held, in a written decision dated April 24, 2019, that Mr. Futterman is not entitled to an automatic reduction of the deficiency claim based on contentions that the real fair market value of the Ladera entities' property exceeded the amount of the RWN claim. Instead, Mr. Futterman's objection to RWN's claim can succeed only to the extent that he can demonstrate that RWN engaged in collusive misconduct or otherwise "exploitative overreaching" during the course of the auction. Otherwise, the waiver of claims and defenses contained in the personal guarantee that Mr. Futterman provided in connection with RWN's loan to the Ladera entities forecloses his objection to the deficiency claim.

The evidence to which Mr. Futterman referred at the May 23–24 hearing showed that a number of participants in the auction process were not happy with certain aspects of that process and, in particular, about delays and possible inefficiencies in the process of qualifying bidders for participation in the auction. There were also indications that there was possible confusion among bidders at the auction as to what they needed to bid in order to outbid the prior offer that had been made by RWN. This uncertainty arose because the RWN plan provided that if RWN succeeded in acquiring the property, it would pay all administrative and priority expenses, and other bidders apparently were uncertain as to what they needed to propose in order to top RWN's commitments. The deposition excerpts that were submitted to me included speculation by the broker, Mr. Robert Knakal, that this uncertainty may have discouraged people from participating in the auction. But I note that the deposition excerpts that were submitted to me did not include any direct statements by potentially interested parties to the effect that they were actually discouraged from participating.

More importantly, these matters were known to Mr. Futterman at the time of the auction. Mr. Futterman or other participants could have sought clarification from me at the time of the

auction or could have complained about these matters prior to the Court's confirmation of the results of the auction. But they did not do so. Mr. Futterman asked for additional time to consider an objection, but the Court ruled that he had already had ample time, and the Court denied the request.

Furthermore, these particular matters do not show that RWN chased away bidders or made side agreements with bidders that had the effect of reducing the bids that the Ladera entities received, or that RWN engaged in collusive or manipulative conduct of a kind that would permit the deficiency claim to be adjusted as a matter of equity under New York law, under the standards set forth in this Court's prior decision. Mr. Futterman contends that such conduct did occur, but he has no direct evidence that it did. As I mentioned, the deposition excerpts do not show that any bidder was chased away or that any bid was suppressed or that any bidder made side agreements with RWN.

Mr. Futterman has also contended more specifically that RWN agreed with Happy Living to do a separate deal after the auction and thereby kept Happy Living from submitting higher bids at the auction. But RWN and Happy Living have denied that they did so.

I must note, too, that in his deposition testimony, Mr. Futterman stated that he had turned away an informal overture from Happy Living in the spring of 2017, at a price of $55 million, and that in the auction process that he was conducting in the spring of 2017 he received four formal bids in the range of $20 million to $40 million. As I noted above, Mr. Futterman contends that the absence of other bidders and the absence of a higher price at the September 2017 auction was attributable to misconduct by RWN. But presumably Mr. Futterman does not contend that his own auction process was tainted. The evidence about the prior bids that Mr. Futterman received during the spring of 2017 suggests that there would be a disputed issue, if the

matter were to proceed to trial, as to whether a lack of interest in participating in the September 2017 auction was based on the price that was going to have to be paid in order to prevail at the auction, rather than other factors.  I am certainly not ruling on that issue at this time.  I am simply noting that there is evidence that would support a view that is contrary to Mr. Futterman's and that would present a ground for litigation.

Mr. Futterman also has offered evidence that RWN took the position after the auction that RWN was entitled to take a longer time to close its purchase of the property than other bidders would have been entitled to.  However, when I learned of this in 2017, I made it immediately clear to RWN that, in my opinion, RWN did not have such rights, and that, so far as I was concerned, RWN was obligated to close right away, in accordance with the schedule that would have applied to any successful bidder.  In addition, I note that there is nothing in the record that suggests that RWN's position on this particular point had any effect on the auction itself.  Mr. Futterman has suggested that perhaps other bidders might have been more interested if everyone, including RWN, had been given the chance to take longer to close.  But that is not what would have happened.  I approved a timetable for closing, and I held that the timetable bound RWN as well as other bidders.

What I decided in 2017 was that RWN was wrong in thinking that it was entitled to extra time.  That miscalculation by RWN therefore did not affect the bids made by other bidders who knew what their closing dates would have to be.  The idea that other bidders were deprived of an opportunity to have a later closing is a false argument, because there was no such opportunity and would not have been any such opportunity.

I do not mean to suggest by my comments that I am exonerating RWN, or that it is impossible that there was any misconduct, or that I am making any finding of any kind as to

whether such misconduct occurred.  I have previously stated, for example, that if RWN let other bidders know that RWN intended to credit bid the full amount of its debt, so as to discourage people from bidding smaller amounts, and if that conduct were shown to have had the effect of discouraging other bids that might not have exceeded the RWN debt but that nevertheless would have reduced the size of the deficiency claim, that might constitute good grounds either to reduce that deficiency claim or, depending on the evidence, to disallow it completely.  I simply note that there are no admissions or evidence that I would regard as smoking guns on these issues, and therefore that litigation over the RWN deficiency claim involves a more-than-minimal risk of an unfavorable outcome for the estate.

Accordingly, the settlement does provide value to the estate insofar as it relates to the RWN deficiency claim.  It accomplishes the best result the estate could achieve with respect to the deficiency claim itself.  It brings certainty to the estate, and it eliminates a litigation risk.

**3.      Provisions of the Settlement Agreement Relating to Lot 24**

That brings us to the most hotly disputed issue at the hearing and the one that is actually the most important to the consideration of the merits of the settlement, which is the effect of the settlement on the potential development of Lot 24.

As I mentioned earlier, the disputes between the parties are based primarily on the way they interpret the terms of the ZLDA.  The parties to the ZLDA were Ladera, LLC and an entity known as 510 Manhattan Affordable Housing L.P., which at that time was the owner of Lot 24 and the owner of another adjacent property referred to as Lot 25.

The ZLDA covers something that the parties have referred to as a merged zoning lot that includes Lots 24, 25, 26, 29, 30, 35, and 1001–1004 of Block 1948 in Manhattan.  Portions of that merged zoning lot are in areas designated as residential zoning district R7, and portions are

in areas designated as residential zoning district R8.  Under the applicable rules, the development

of each lot is subject to limits based on the floor area development rights that each lot owns.

Those rights, in turn, depend on the size of the lot and the zoning district in which the lot is

found.  This may be an oversimplification, but generally, the amount of floor area development

rights that a property has is a product of multiplying the square footage of the property's lot

coverage times a multiplier that differs from one zoning district to another.  In an R7 residential

district, for example, the multiplier is 4, so that a lot with a square footage of 2,000 has floor area

development rights of 8,000 square feet.  That means for our purposes that the owner can

develop a condominium building of 8,000 square feet.

Parties to a merged zoning lot may agree among themselves as to how the floor area

development rights for the merged zoning lot are to be allocated and used.  I do not mean to

suggest that they have unfettered authority to do whatever they want, because I suspect there are

many rules that say what can and cannot be done.  Essentially, though, floor area development

rights may be sold or transferred from one property owner to another, and the ZLDA is a filed

agreement that provides notice as to which parties are entitled to exercise which rights.

In this case, the parties agree that Ladera, LLC acquired, at a minimum, the right to use

floor area development rights that originally were allocable to the Lot 24 Property and other

properties that are part of the combined zoning lot.  They also agree that if the presently filed

development plans for the Ladera property are followed and are not amended, some of the total

floor area development rights that the Ladera entities have the theoretical right to use will not

actually be used.

Where the parties differ, however, is in their interpretation of what happens if there are

unused floor area development rights.  The Trustee and RWN contend that the floor area

development rights were sold outright to the Ladera entities and are now owned by the entity to whom the Ladera entities' assets have been sold.  In their view, the current owner could seek to use some of those rights through amendments to development plans, or could sell some of those rights in the future to other members of the combined zoning lot in the event those other members wish to use them, or could simply elect not to use them at all.  Mr. Futterman, on the other hand, suggests that any floor area development rights that are not actually used at the Ladera site should revert either to Lot 24 specifically or generally to the other members of the combined zoning lot, at which point he believes that the Lot 24 owner, Jenco, would have the right to build a condominium unit that is four or five stories in height.

The parties' expert witnesses have confirmed that floor area development rights may be sold from one entity to another.  They also agree that an entity that owns unused floor area development rights has the right to keep them.  It may hold on to them for possible future use or may decide not to use them at all, or may hold them until such time as it may be profitable to sell them to someone else who might be able to use them.  The question, then, is whether the underlying agreements in this case provided for an outright sale of the Lot 24 development rights to Ladera or whether, instead, the agreements merely provided Ladera with a limited right to use such rights, with the owner of Lot 24 retaining or reacquiring by reversion the ownership of any rights that are not used.

I have reviewed the relevant contracts and I have considered the parties' evidence.  I find, for purposes of considering the proposed settlement, that Mr. Futterman's contentions on these issues are extremely weak, to the point of likely being the subject of a successful motion to dismiss in the event they were litigated.

The provisions of the ZLDA are clear.  They recognize the existence of an outright sale and transfer.  They do not reflect the retention by Lot 24 of any rights at all.  Nor do they provide for any reversion of rights to Lot 24 in the event that the owner of the Ladera site does not use such rights.

The eighth "whereas" clause of the ZLDA provides that there were "Floor Area Development Rights" appurtenant to Lot 24 that were not already in use at the time of the ZLDA and that were available for "transfer" to Ladera.  The second "whereas" clause in the ZLDA acknowledges that Ladera had acquired the "Excess Floor Area Development Rights" from the owner of Lot 24.  This, it turns out, is a reference to the fact that the relevant rights had been sold to Ladera under a separate contract, which is described further below.  The term "Excess Floor Area Development Rights" is defined in the ZLDA as "all" of the Floor Area Development Rights appurtenant to the Lot 24 and 25 premises that were in excess of the total floor area development rights that were already in use by existing improvements on Lots 24 and 25.  The parties agree that, on the date of the ZLDA, the Lot 24 Property was vacant and that there was an existing building on Lot 25 that used 9,479.41 square feet of floor area development rights.

The definition in the ZLDA of "Retained Floor Area Development Rights" also makes clear that the only floor area development rights and lot coverage rights that were retained for Lots 24 and 25 were those already used by the existing building on Lot 25.  The Lot 24 owner did not retain any rights at all other than possibly such rights as might be available in the event of an "Upzoning" as defined in Part 2(c)(5) of the ZLDA, which would occur if the applicable Zoning Resolution were amended in a manner to "increase[] the Floor Area Development Rights ascribable to . . . the Lot 24 & Lot 25 Premises."  The parties agree that there has not been an Upzoning for these sites.

24

Exhibit D to the ZLDA is a table that lists the zoning lot areas for the relevant properties and the total floor area development rights applicable to each property, as well as the number of retained development rights for each property and the square footage of Excess Floor Area Development Rights being transferred to Ladera from Lots 24 and 25. Exhibit D shows that Lot 24 had 10,092 square feet of floor area development rights and that the Retained Floor Area Development Rights for Lot 24 were zero. Exhibit D also showed that Lot 25 had 10,092 square feet of floor area development rights and that the only retained rights for Lot 25 were equal to the 9,479.41 square feet of development rights used by the existing building. Exhibit D further showed the allocation of floor area development rights after the "transfer," and confirmed that the Floor Area Development Rights available to Lot 24 would be zero. A footnote on Exhibit D also made clear that the listed numerical calculations did not include potential "Bonus Floor Area Development Rights," which are defined in the ZLDA as additional floor area development rights that might be authorized under various programs, but that all Bonus Floor Area Development Rights that were available or that thereafter become available for Lots 24 and 25 were allocated to the Ladera sites.

Article III of the ZLDA further confirms that, except as otherwise specified in the ZLDA, the Lot 24 and 25 owners retained rights in and to the Lot 24 and 25 premises and the Retained Floor Area Development Rights, and that the Ladera entities "shall retain all rights in and to the Developer Floor Area Development Rights." The definition of "Developer Floor Area Development Rights" included all of the Excess Floor Area Development Rights that were transferred. Far from indicating that any of those rights would revert, Article 3 in fact says the very opposite: that the Ladera entities shall retain all of those rights. There are no time limits or

conditions attached to this statement, and no language that would support the notion that anything other than an outright transfer of development rights had occurred.

Article V of the ZLDA also sets forth a floor area notice that gives notice that the ZLDA benefits the Ladera Project and "restricts" Lot 24 by limiting the Floor Area Development Rights which are appurtenant to Lot 24 to the Retained Floor Area Development Rights that were appurtenant to those premises.  As I have already noted, Lot 24's Retained Floor Area Development Rights were set forth in Exhibit D, and the amount of those retained rights is listed as zero.

Similarly, the ZLDA did not reflect any purported reversion of unused development rights to the Lot 24 owner.  Certainly, if such a reversion had been intended, one would have expected it to appear in an express provision, but there is no such provision.  To the contrary: the definition of "Developer Floor Area Development Rights" that appears in the ZLDA included all of the Excess Floor Area Development Rights that were transferred from Lots 24 and 25. Paragraph 4 of Article II of the ZLDA includes a commitment by the Lot 24 and Lot 25 owners that no new buildings, improvements, alterations, or additions on those sites would utilize "any" of the Developer Floor Area Development Rights.  The ZLDA did not set forth any time limit on that covenant or any condition to it.  In other words, the Lot 24 owner agreed not to use any of the Excess Floor Area Development Rights that had been transferred to Ladera.  Rather than providing for a reversion of unused rights, therefore, the agreement instead provides for a permanent transfer and a permanent agreement by Lot 24's owner not to use any of the transferred rights.

In addition, Article VIII of the ZLDA addressed the possibility that the combined zoning lot might be enlarged to include additional parcels.  Paragraph A of Article VIII sets forth a

26

consent by the owner of Lots 24 and 25 to such an expansion and also a consent to the "transfer,

utilization, or redistribution" by Ladera of any of the Developer Floor Area Development Rights,

with exceptions only for the Retained Floor Area Development Rights and potential Upzoning

rights.  Again, this part of the agreement simply cannot be squared with Mr. Futterman's

contention that any rights that were not used on the Ladera site itself would revert to Lot 24.

This provision instead expressly contemplates the possibility that Ladera could transfer some of

the acquired rights to other sites.

Mr. Futterman's argument to the contrary is based on language in the ZLDA that states

that Floor Area Development Rights are being transferred from Lots 24 and 25 "for utilization on

the developer premises."  In his view, this is the equivalent of saying that the transfer was made

solely to the extent that such rights actually are used in the Ladera Project.  I do not believe that

is a reasonable interpretation of the language of the contract.  As is clear from the provisions that

I have just reviewed, there is nothing in the ZLDA, other than Mr. Futterman's strained

interpretation of this "utilization" language, that suggests that the owners of Lot 24 and 25

retained any interest in any of the Floor Area Development Rights that were transferred to

Ladera.

First, Exhibit D to the ZLDA and other provisions of the ZLDA make clear that the only

Retained Floor Area  Development Rights were as to a building that already existed on Lot 25.

The Retained Floor Area Development rights for Lot 24 are zero.  Similarly, for the reasons I

have already noted, the ZLDA makes clear that unused rights would not revert to Lot 24.  To the

contrary, the ZLDA contained an explicit agreement that the Lot 24 would never use those rights

for any new building on the site.  Interpreting the ZLDA in the manner that Mr. Futterman

suggests would be in plain conflict with many clear and unambiguous statements in the ZLDA,

27

which together make clear that all of the excess development rights appurtenant to Lot 24 were irrevocably acquired by Ladera and that the retained rights were zero.

Second, as noted above, the second recital to the ZLDA states that Ladera acquired the Floor Area Development Rights from the owner of Lot 24 and 25 pursuant to a separate contract. The parties have now submitted the contract that governed the acquisition, and the Court has reviewed it. The contract is entitled "Amended and Restated Contract of Sale" and is dated February 22, 2013. Section 1 of that contract provides that the "Seller," 510 Manhattan Affordable Housing L.P., "shall sell to Purchaser," which is defined as Ladera, LLC, and "Purchaser shall purchase from Seller at the price . . . set forth in [the contract], Seller's right, title, and interest in and to all unused floor area and zoning and development rights in excess of development rights already utilized" with respect to Lots 24 and 25. There is nothing in this separate contract that purports to limit or restrict the outright terms of sale. There is no provision for a retention by Lot 24 of any existing rights, and no provision for a reversion to Lot 24 of any unused rights. Moreover, the sale contract does not have the "utilization" language that appears in the ZLDA and that was the basis of Mr. Futterman's contentions at trial. In sum, there is nothing in this separate contract that could reasonably be interpreted as anything other than an outright sale of development rights.

Third, even if Ladera had not acquired outright ownership of the floor area development rights from Lot 24, I must note that note that no explanation was offered as to why any rights that are unused at the Ladera Project should be deemed to be the particular Floor Area Development Rights that Ladera acquired from Lot 24, as opposed to the Floor Area Development Rights that Ladera acquired from other lots that are part of the combined zoning lot. Mr. Futterman's testimony about the purported value of the Lot 24 Property, in fact, was based on the assumption

that up to 14,890 square feet of unused floor area development rights could be used on Lot 24

itself.  But Exhibit D to the ZLDA makes clear that Lot 24 only had 10,092 square feet of its own

floor area development rights, so that even if there were a full reversion to Lot 24 of all of its

own original rights, that would only permit construction of a considerably smaller project than

the one that Mr. Futterman envisions for the site.

Mr. Futterman also testified that at the time of the ZLDA he had entered into an

agreement to buy Lot 24 and that it was his intent that Lot 24 ultimately would use any

development rights that were not used in the Ladera Project.  If the bankruptcies had not

intervened and if Mr. Futterman had been the owner of both Ladera and Lot 24, then it would

have been in his power to cause a transfer of rights from Ladera to Lot 24 and to amend the prior

contracts.   But this is not the kind of intent that is relevant in interpreting the contracts that were

already in place.  *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 69 (2d Cir. 2005)

(explaining that, under New York contract law, "the best evidence of what parties to a written

agreement intend is what they say in their writing"); *Seabury Constr. Corp. v. Jeffrey Chain

Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (noting that New York courts effectuate the plain language

of the contract in the absence of ambiguity and will afford the meaning to an unambiguous

provision that is "gleaned from the face of the instrument" (citation omitted)); *In re Quality

Gutter Supply Corp.*, 350 B.R. 141, 144 (Bankr. E.D.N.Y. 2006) ("The Court's obligation is to

effectuate the intent of the parties as expressed in the chosen contractual language.").

Mr. Futterman's business plans as to what he might do, and as to future agreements he

might have caused the entities to enter into, did not alter the terms of the agreements to which the

entities actually were parties.  The contracts provide for a complete transfer of floor area

development rights.  Now that the Ladera entities' assets and rights have been sold, the new

29

owners are entitled to use, retain, or sell those assets and rights in accordance with the signed contracts and in accordance with their own business interests.

There was also a suggestion at the hearing that no other owner of land in the combined zoning lot could use any of the floor area development rights that Ladera purchased and that the current owners of the Ladera Project might not use. Even if that were true, it would not mean, as a contractual or a legal matter, that the owner of Lot 24 has any retained rights, and Mr. Futterman's expert witness did not suggest otherwise. In addition, even if the Lot 24 owner were the only one who could use those rights, presumably the owner of the Ladera site could decide whether to sell the rights to the Lot 24 owner. In short, Jenco does not have the right simply to take them. Nor does it have the right to dictate the terms of a sale, or even to say whether the rights will be used at all.

Furthermore, Mr. Futterman's arguments about parties who might be able to use the rights are premised on the assumption that none of the owners of the other lots will ever want to expand their existing buildings or to replace their existing buildings with new ones. In theory, for example, the current owner of Lot 25 might wish to demolish its existing building and to replace it with something larger. The only floor area development rights that the Lot 25 owner retained were the rights used by the existing building, so it would need to acquire more rights in order to build something larger. There is no reason why the current owner of the Ladera site could not sell its excess rights to the Lot 25 owner in such a case.

There is no provision in the ZLDA itself, or in the contract by which Ladera acquired the floor area development rights, that retains any rights for the Lot 24 owner. When viewed in this context, the various items in the settlement agreement that Mr. Futterman regards as concessions and as additional restraints on the potential development of Lot 24 are, in fact, just accurate

statements of the restrictions that Mr. Futterman himself already placed on Lot 24. For the sake of completeness, I will review those provisions in detail.

The provisions of the proposed settlement agreement that relate to Lot 24 appear on pages 3 through 5 of the proposed Settlement Agreement. Mr. Futterman's counsel has previously acknowledged that parts (i), (ii), and (iii) of subpart "a" are accurate statements.

Subpart (a)(iv) states that "Lot 4 has zero (0) Retained Floor Area Development Rights (as such term is defined in the ZLDA)." Mr. Futterman has disputed this statement, but in fact, for the many reasons I have already stated, it is an exact statement of what Exhibit D to the ZLDA clearly states.

Subpart (a)(v) states that "the Excess Floor Area Development Rights (as such term is defined in the ZLDA) transferred from the Lot 24&25 Premises (as such term is defined in the ZLDA) to the Developer Premises (as such term is defined in the ZLDA) pursuant to the ZLDA include the 10,092.00 square feet of permitted floor area attributable to Lot 24." This, too, is an exact statement of what the ZLDA and Exhibit D to the ZLDA provide. While Mr. Futterman has criticized this portion of the settlement agreement based on his contention that the transfer was only of such rights that are actually used in the Ladera Project, I have rejected that contention for the reasons stated above.

The first sentence of subpart (a)(vi) states that "Developer (as such term is defined in the ZLDA) has the right to utilize said 10,092.00 square feet of floor area attributable to Lot 24, together with any Bonus Floor Area Development Rights (as such term is defined in the ZLDA) generated by Lot 24." This, too, is an exact statement of what the ZLDA provides and also of what is provided in the Amended and Restated Contract of Sale that was submitted to the Court. At one hearing, Mr. Futterman's counsel stated that he disputed the statement insofar as it

31

applies to Bonus Floor Area Development Rights.  However, section 2.01(j) of the Amended and

Restated Contract of Sale makes clear that the rights that were being sold to Ladera included all

"Bonus Floor Area Development Rights attributable to the Seller Premises."  The footnote to

Exhibit D of the ZLDA similarly makes clear that all Bonus Floor Area Development Rights

were transferred to Ladera.  Accordingly, the statement in the Settlement Agreement is, in fact,

an accurate statement of what those other contracts provide.

Mr. Futterman's counsel has acknowledged that the second sentence in subpart (a)(vi),

which relates to rights in the event of an Upzoning, is not problematic.

Subpart "b" of the portions of the settlement agreement that relate to Lot 24 include

certain agreements as to what the ZLDA provides concerning "Lot Coverage."  Subparts (b)(ii)

and (iii) provide that the Developer has the right to use all Lot Coverage attributable to Lots 24

and 25 in excess of the Lot Coverage that was used by the building that was already present on

Lot 25, and that "the owner of Lot 24 may not increase the Lot Coverage of Lot 24 unless and

until the Lot Coverage of Lot 25 is reduced in an equal amount."  Again, these are accurate

statements of what the ZLDA provides.

The definition of "Retained Floor Area Development Rights" in the ZLDA refers to the

floor area development rights already used on Lot 25 and to "the lot coverage utilized by the Lot

24 and 25 building as of the date hereof."  All other rights were transferred to Ladera.  In

addition, as noted above, the owners of Lots 24 and 25 agreed never to build a building that used

any of the Excess Floor Area Development Rights that were transferred to Ladera.  Given the

definition of "Retained Floor Area Development Rights," and its inclusion of a reference to the

lot coverage used by the existing building, the only way that a building could be built on Lot 24

would be if the lot coverage and floor area development rights used by the existing Lot 25 building were somehow to be reduced.

Subpart "c" of the relevant portion of the settlement agreement states that the owner of Lot 24 and Mr. Futterman will not interfere with the development of the Ladera site. Subpart "g" on page 4 of the settlement agreement also includes an agreement to cooperate with applications for permits, variances, licenses, and other items in connection with the development of the Ladera site. I note that similar agreements appear already in the ZLDA, and in any event, these are not unreasonable provisions. What RWN wants from the settlement and the reason it is dropping its deficiency claim and also making an additional payment is for the Ladera Project to be completed without risk of further litigation or interference. This is entirely understandable under the circumstances.

Subpart "d" of the Lot 24 provisions in the settlement agreement relates to the terms of a light and air easement and is not challenged by Mr. Futterman.

Subpart "e" is an agreement that no applications will be made for the development of Lot 24 until the earlier of the issuance of a permanent certificate of occupancy for the Ladera Project or the occurrence of an "Outside Date," with the Outside Date representing the final day of any five-month period during which the Ladera site owner has failed to use commercially reasonable efforts to obtain a permanent certificate of occupancy. Mr. Futterman has complained that the amount of time that it takes to obtain a permanent certificate of occupancy can vary considerably, and that this is too long a time for the imposition of the development restriction as to Lot 24. However, for the reasons already stated above, the current terms of the ZLDA essentially block any development of the Lot 24 Property. This provision of the settlement agreement allows for a potential future development. The date may not occur so quickly as Mr.

33

Futterman would like, but contrary to what he says, this provision does not involve the imposition of unreasonable additional restrictions to which the property is not already subject.

Subparagraph "f" of the Lot 24 portions of the settlement agreement further states that the Lot 24 owner will not seek to modify a prior Land Disposition Agreement with the City of New York until the earlier of the issuance of a permanent certificate of occupancy for the Ladera site or the Outside Date. It also provides that the Lot 24 owner will consent to the placement of utilities in the sidewalk adjacent to Lot 24. Mr. Futterman's primary objection to this provision is that it potentially postpones development of the Lot 24 site. But the ZLDA already does that. The purpose of this provision is to prevent actions that indirectly could affect the development of the Ladera site and that would undermine the commitments in both the ZLDA and the settlement agreement that Lot 24 projects would not interfere in any way with the Ladera Project. Given the friction between the parties, the history of the disputes between them, and their propensity for litigation, I do not find this unreasonable.

Finally, the settlement agreement provides that the Trustee shall be the sole person authorized to act on behalf of Lot 24, including, without limitation, with respect to the ZLDA. As such, Mr. Futterman shall not be authorized to take any action directly or indirectly on behalf of Lot 24 prior to the issuance of the permanent certificate of occupancy. This is an unusual provision, and if there had not been such a history of warfare between Mr. Futterman and RWN, I might wonder what the purpose of the provision is. But as I said above, what RWN wants from the settlement, and the reason it is dropping its deficiency claim and making an additional payment, is peace during the completion of the Ladera Project. Essentially, the purpose of this provision is to ensure that an independent trustee, and not Mr. Futterman himself, will make decisions as to whether anything is happening in the course of the development of the Ladera

34

property that adversely affects the rights of the Lot 24 owner.  That is a reasonable provision

under the circumstances of this particular case and given the history of the disputes between the

parties.

### Application of Factors Bearing on Approval of the Settlement

Having reviewed the evidence and the parties' contentions, I will now return to the

specific factors that the Second Circuit Court of Appeals has identified as being relevant to a

determination of whether a settlement should be approved.

The first factor is to compare the possibility of success and the benefits offered by the

settlement.  As noted above, the maximum the estate could accomplish by litigation over the

RWN deficiency claim is a defeat of that claim.  The settlement provides for a withdrawal of the

claim, which is the best possible outcome that litigation could achieve.  The settlement also

provides for a payment of $1.675 million dollars, which litigation would not achieve.

As to Lot 24, the comparison I should make is as to the value of Lot 24 in light of the

settlement provisions, compared to the value that Lot 24 would likely have if the estate were to

continue litigation and if it were not to make the clarifying agreements about Lot 24 in the

settlement agreement.  As explained above, the terms of the proposed settlement agreement

appear merely to be confirmations of development restrictions that already apply to the Lot 24

Property.  They do not appear to sacrifice any meaningful rights that the Lot 24 owner actually

has.  The most that the settlement agreement does is to prevent Mr. Futterman from pursuing

litigation based on his contractual arguments that unused development rights revert to the Lot 24

owner.  Those contentions are extremely weak and of dubious value, as I have noted, and in fact

could well be subject to dismissal.  The elimination of the risk to the estate posed by the RWN

deficiency claim, plus the additional payment of $1.675 million, is more than ample

compensation for the loss of the dubious litigation claim as to the ability of Lot 24 to use unused floor area development rights.

The second factor is the likelihood of complex and protracted litigation in the absence of a settlement. It is quite clear that if there is no settlement, then there will be a litigation over RWN's deficiency claim, which given the history of these parties would be followed by additional appeals, no matter what the outcome. In addition, it is quite clear that the disputes over Lot 24 and its alleged retention of unused development rights would just produce another chapter in the litigation wars between Mr. Futterman and RWN. There may be appeals from an order approving a settlement in this case, so that as a practical matter, a settlement may not bring a full and final end to the parties' controversies, but it will at least narrow and simplify them significantly.

The third factor is the interests of creditors, including the degree to which creditors either do not object or affirmatively support the proposed settlement. I find that the settlement is in the interests of creditors. It removes the risk that the RWN claim poses to other creditors' recoveries. It provides a payment of $1.675 million to the estate, and its terms as to Lot 24 do not sacrifice any valuable rights that the estate likely owns.

Three creditors, holding approximately fifty percent of the unsecured claims, have filed objections to the settlement. One was Mr. Futterman's father, and another was his former law firm. The objections are premised on the assumption that Mr. Futterman is correct in his arguments that the defeat of the RWN deficiency claim is inevitable and that the settlement agreement is somehow compromising important and valuable rights that Jenco has for the development of the Lot 24 Property. I want to give proper weight to the views of individual creditors, but I have already found, for the reasons stated above, that the defeat of the RWN

36

deficiency claim is not a foregone conclusion and that there is little to no likelihood that Jenco

actually has the development rights that Mr. Futterman contends it has.

Under these circumstances, I must do what is actually in the interests of creditors. I

cannot do otherwise, simply because some creditors, those who have particular ties to Mr.

Futterman, would choose to roll the dice and to take risks that, in the Trustee's judgment, and

frankly in my own judgment, would not be worth taking.  *See In re Republic Airways Holdings,*

*Inc.*, 2016 WL 2616717 (S.D.N.Y. 2016) (observing that while a court may rely on the opinion

of the debtor, parties to the settlement and the professionals in analyzing the reasonableness of a

settlement "the decision to approve or deny a particular settlement involving a bankruptcy estate

lies within the discretion of the bankruptcy court" (citations omitted)); *In re Purofied Down*

*Prods.*, 150 B.R. 519, 522–23 (S.D.N.Y. 1993) ("[I]nformed by the opinion of the parties, the

trustee, and counsel, and hence the bankruptcy court must make a considered, *independent*

judgment as to whether a settlement is fair and equitable and in the best interests of the estate."

(emphasis added)); *In re WorldCom Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006) ("While the

bankruptcy court may consider the objections lodged by parties in interest, such objections are

not controlling. . .[T]he bankruptcy court must still make informed and independent

judgments.").  And in this particular case, since it is a case where a trustee has been appointed, it

is the business judgment of the Trustee in recommending the settlement that should be factored

into the Court's analysis.

The fourth factor is whether other parties in interest support the settlement.  I believe that

for purposes of this case, that is the same as the factor that I have just discussed.

The fifth factor is the competency and experience of counsel supporting the settlement

and the experience of the bankruptcy judge in reviewing the settlement.  Nobody has criticized

the experience and competency of the Trustee and of the Trustee's counsel. The parties disagree about the terms of the deal, but the Trustee's position certainly is not an unreasonable one. As to the experience of myself as the bankruptcy judge: I suspect this factor may be more relevant to an appellate court in reviewing any decisions that I might render, but I will note that I am very familiar with the details of the parties' disputes, and based on my knowledge of those disputes, as well as my own prior experience as a commercial litigator, it appears to me that the settlement is a sound one and a proper exercise of judgment by the Trustee.

The sixth factor is the nature and breadth of the releases to be obtained by officers and directors. This might be relevant in a different case as an indication of potential self-interest, if officers and directors were getting their own benefits from a settlement. It is not relevant here. There are no releases for insiders. As to conflicts generally, Mr. Futterman's counsel has acknowledged that there is no contention that the Trustee suffers from any conflict of interest.

Finally, the seventh factor is the extent to which the settlement is the result of arm's-length bargaining. This appears clearly to be the case, and there is no suggestion otherwise.

I find, therefore, that the settlement has substantial benefit to the estate and that the Trustee has exercised reasonable business judgment in entering into it. In fact, even if, as Mr. Futterman suggests, I were to decide that a defeat of the RWN deficiency claim were a foregone conclusion, I would nevertheless hold that the Trustee has exercised reasonable business judgment in entering into the settlement. I will therefore enter an order approving the settlement.

Dated:  New York, New York
        June 20, 2019


                                        /s/ Michael E. Wiles
                                        Honorable Michael E. Wiles
                                        United States Bankruptcy Judge